13L 676
d110 634
e110 635

ROBT. HOTTELL and WIFE v. JOHN J. BROWDER et. al.

WILL. *Construction.* The will of the testator provided: "I will, bequeath and devise all the remainder of my estate, both real and personal, to my two daughters, Julia and Elizabeth, for their sole and separate use, share and share alike, free from the contracts, debts or liabilities of their respective husbands, and·in case of the death of either of my said daughters above named, then my will is that all that part of my estate which hereby I give to ·her, shall go and descend to her children." *Held,* that an absolute estate is given to the daughters exclusive of the marital rights of the husband, with a ·conditional limitation over, in the nature of an executory devise to their children on the death of either of them.

FROM BRADLEY.

Appeal from the Chancery Court at Cleveland. W. M. BRADFORD, Ch.

J. N. AIKEN and W. L. HARBESON for Hottell.

P. B. MAYFIELD and GAUT & GAUT .for Browder.

FREEMAN, J., delivered the opinion of the· court.

This bill is filed by the children and representatives of children of Elizabeth Simmons, deceased, against the purchasers of the land holding under a conveyance by their mother and father regularly executed.

The main question in the case, if not the only one, is whether the mother took · an absolute estate under the· will of her father, Alfred Castiller, with power to convey an unconditional fee in the same, or whether her children did not take, as purchasers under the will, on her death.

After providing that all his debts should be paid out of his estate, as soon as possible after his death, the testator says: "My will is that as soon after my death as possible, that my executor hereafter named advertise and sell all my farming implements and utensils, and all my stock on hand, consisting of what horses, hogs, cattle and sheep I may have on hand at my death, and the proceeds of the same I want paid to George W. Sallie in payment of a debt I owe him, and in case the proceeds of my stock and farming utensils should not be sufficient to pay it all, the balance will be paid out of any debts due me. After all my just debts are paid, as well as my funeral expenses, I will, bequeath and devise all the remainder of my estate, both real and personal, to my two daughters, Julia Calloway and Elizabeth Simmons, for their sole and separate use, share and share alike, free from the contracts, debts or liabilities of their respective husbands, *and in case of the death* of either of my said daughters above named, *then* my will is that all that part of my estate which hereby I give to her shall go and descend to her children."

This will was executed on December 15th, and probated January 5th, after. The draftsman tells us he was sent for to write the will, found the testator on his death-bed, and very low, unable to sit up, who told him he never expected to recover, and wished him to write his will, which he did.

The controlling rule, to which all others must bend in the construction of any will, is to ascertain the intention of the testator expressed in the paper. This

rule is grounded in the nature of the act to be done by courts in such construction, that is to construe a writing, authorized by. law to be made, which purports to be a disposition of the property of a testator according as he wills to do. This will or intention must of necessity control, unless it contravene some rule of law forbidding it, or some well defined principle of public policy.

Although our books, especially our older ones, are filled with precedents prescribing in many cases arbitrary rules for ascertaining the meaning of testators— the practical common sense of more modern decisions, both in this country and England, has reached the conclusion given by Lord Selborne, Chancellor of England, in the case of *Wait* v. *Settlewood,* 4 Moaks' English R., 762, cited with approval by this court in *Traker* v. *Traker,* 6 Baxt., 352, that "there can be nothing more certain than that any will is to be construed by itself, not with reference to other wills, and all the light that can be got from other decisions serves only to show in what manner the principles of reasonable construction have, by judges of high authority, been applied in cases more or less similar." It was added in that case, "that in the application of all rules, the great leading idea is, and should be, to arrive at the actual intention of the testator and carry that out, unless in violation of some rule of law or public policy": *Id.* We do not think it necessary to go over the precedents on the question of the meaning of testators in other wills.

This intention is to be gathered primarily, if not

exclusively, from the language used by the testator,
but in order to its proper understanding, we should
put ourselves as near in his place as possible, and to
do this may ascertain the circumstances surrounding
him, the state and condition of his property, as well
as his family, and objects of his bounty.

With these principles to guide us, putting ourselves
in his place, and reading his language from this stand-
point, it is impossible to reach the conclusion main-
tained by the respondents, that is that the testator
meant by "and in case of the death of either of my
said daughters above named, *then* my will is that all
that part of my estate which hereby I give to her
shall go to and descend to her children." The con-
tention is, that the testator meant to provide for the
contingency of either of his daughters dying before
the testator. In view of the facts as stated, this con-
clusion is so far-fetched and so unnatural, especially
when we see the daughters were both in perfect health,
and had children, the latter, no doubt, well known to
the testator, and objects of a grandfather's affection,
as hardly to require an argument to refute it. No
such thought, in the nature of things, could have been
in his mind.

On careful consideration the principles of the case
of *Alston* v. *Davis*, 2 Head, 268, involves a similar
conclusion to the one we have reached. In that case,
as in this, by the first clause of the will, an absolute
gift was made "of all the rest and residue of testator's
estate to parties named, at their death to be divided
equally among their bodily heirs," which was held to

mean children. The contest was as to whether Mrs.
Davis took an absolute estate, she having no children.
It was held she did, because there being no other
limitation over, except the one which failed, the ab-
solute gift was not defeated, but took effect. The
principle is thus stated by the court: "·The general
principle is well established, that where, by the will,
an absolute gift of the property is made in the first
instance, followed by a limitation over on the death
of the devisee or legatee, the absolute gift is not
taken away by the gift over, *unless* the gift over may
itself take effect," page 268. Again the court say,
page 269: "The gift is not subject to any other
contingency or limitation beyond that expressed, *and*
if that *cannot* take effect, the gift remains absolute."
This clearly goes on the assumption, that if the gift
over can take effect, then the first estate will be held
subject to the condition, and if it shall occur, such
limitation is effective to carry the estate to the devisee
or legatee, notwithstanding the absolute gift in the
first taker. Here the limitation over, in the nature
of any executory devise, may take effect, because the
first taker dies leaving children, and so they take
under the rule laid down." In the case referred to
the first taker, took an indefeasible estate because of
the failure of Mrs. Davis to have children. For the
opposite reason it is defeated in this case, because the
first taker dies leaving children, who may take under
the executory limitation.

The language of the will in the first part of the
clause gives an absolute estate to the daughters, ex-

clusive of the marital rights of the husbands, with a conditional limitation over, in the nature of an executory devise to their children on the death of either of them. We cannot doubt this was the intention of the testator, from the language used, and this is rendered indubitable when the meaning of this language is sought in the light of the surrounding circumstances to which we have referred.

The result is, that the decree of the chancellor and report of the Referees holding the contrary is reversed, and a decree here in accord with the view indicated by this opinion.

It is earnestly insisted, however, that in this court the defendants, the present occupants of the land, are entitled to have so much of the purchase money paid by the purchaser, from Simmons and wife, as may be shown to have been properly applied to the payment of debts of the grandfather, Alfred Casteller.

It is claimed in the answer of respondents that debts over and above the personal assets, amounting to $1,246.48, were paid out of the proceeds of the land.

The principle underlying this view is that where parties purchasing lands the title to which fails, and the purchase money can be or is shown to have gone to discharge debts which cover a proper charge on the lands as against complainants recovering it, a court of equity will apply the rule that he who seeks equity must do equity and will subrogate the purchaser to the rights of the creditor so paid. This doctrine has been frequently applied by this court.

But the question is whether on the facts in this record the principle can be applied.

By another clause of the will of testator he provides as follows: "But in making the division between my said two daughters Julia and Elizabeth, R. J. F. Calloway, the husband of my daughter Julia, owes me one thousand dollars, and instead of paying it to my estate I want it deducted from Julia's share of my estate, and Julia to only have the balance of her half after the one thousand dollars is deducted from it. He also says, he had borrowed from Mrs. Cooper about $1,300, for his son-in-law Calloway, and gave his note for it, with Calloway surety." But the debt is, in fact, Calloway's; but in case my estate should have said debt to pay, then in that case my will is that the amount of it also be deducted from my daughter's share of my estate in making the division aforesaid."

The executor, J. H. Gaut, Esq., while he says it would have been necessary to sell a portion of the land to pay debts, yet says the only debt for which such necessity arose was the Cooper debt, as he recollects it. But in this we think he is probably mistaken, as the land sold for $6,500, part of this on time, it is true, and he shows most definitely that after paying all debts and charges of any kind against the estate he had in his hands $7,770.80, and paid over to Mrs. Simmons and Calloway the sum of $6,770.80—to Mrs. Simmons $3,885.40, and Mrs. Calloway $2,885.40. The difference in amount paid to the sisters, he says, was caused by the charge in the will of the one thousand dollars due by Calloway,

which he charged on Mrs. Calloway's share, as required by the will.

It is certain from these facts and figures that after paying all the debts on a final settlement, he had in his hands more than the amount the land sold for by the difference between $7,770.80 and $6,500, which is $1,270.　It is probable this difference was absorbed by his costs and charges as executor, so as to reduce the amount for division which he paid the two sisters, to wit, the sum of $6.770.80.　That this was the true amount due them there can be no question, not only from the known integrity and accountability of the executor in his business relations, but from the fact that he swears from the receipts of the parties as to the amounts, and shows that he had carefully examined the facts, and found that he had omitted to charge them with twenty dollars paid out in costs of suits during his administration.

With these facts in the record, and nothing to contravene them, it is clear there is no ground on which to sustain the contention of respondents, or basis for a reference on this question.

The respondents claim they have put valuable improvements on the land, and complainants ask an account of the rents, which, however, would be incident to their recovery any way.

Complainants will have a decree for possession of one-half the land with proper directions for its division, and will be entitled to reasonable rents for the same after the death of their mother.　Respondent will be credited with the *enhanced* value of one-half

of the land at the time received by complainant, by reason of any such improvements then upon it.

The case will be remanded for this account, respondents paying the cost of this and court below up to this time.